**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| MERRIGO LIFE LLC,<br><br>    Plaintiff,<br><br>v.<br><br>THE INDIVIDUALS, CORPORATIONS, LIMITED LIABILITY COMPANIES, PARTNERSHIPS, and UNINCORPORATED ASSOCIATES IDENTIFIED ON SCHEDULE "A,"<br><br>    Defendants. | Case No. 1:25-cv-02699<br><br>JURY TRIAL DEMANDED |

**VERIFIED COMPLAINT**

Plaintiff Merrigo Life LLC ("Plaintiff") hereby brings the present action against Individuals, Corporations, Limited Liability Companies, Partnerships, and Unincorporated Associates Identified on Schedule A, attached hereto (collectively, "Defendants") as follows:

### I.   JURISDICTION AND VENUE

1. This Court has original subject matter jurisdiction over Plaintiff's claims pursuant to the provisions of the Lanham Act, 15 U.S.C. § 1051, et seq., 28 U.S.C. § 1338(a)-(b) and 28 U.S.C. § 1331.

2. Venue is proper in this Court pursuant to 28 U.S.C. § 1391, and this Court may properly exercise personal jurisdiction over Defendants because Defendants structure their business activities so as to target consumers in the United States, including Illinois, through at least the fully interactive e-commerce stores operating under the aliases identified on Schedule A attached hereto (the "Seller Aliases"). Specifically, Defendants have targeted sales to Illinois residents by setting up and operating e-commerce stores that target United States consumers, offer

shipping to the United States, including Illinois, accept payment in U.S. dollars and, on information and belief, sell products using infringing and counterfeit versions of Plaintiff's federally registered trademarks (collectively, the "Unauthorized Products") to residents of Illinois. Each of the Defendants is committing tortious acts in Illinois, is engaging in interstate commerce, and has wrongfully caused Plaintiff substantial injury in the state of Illinois.

## II. INTRODUCTION

3. Plaintiff filed this case to prevent e-commerce store operators who trade upon Plaintiff's reputation and goodwill from further selling and/or offering for sale Unauthorized Products. Defendants create e-commerce stores under one or more Seller Aliases and then advertise, offer for sale, and/or sell Unauthorized Products to unknowing consumers. E-commerce stores operating under the Seller Aliases share identifiers, such as design elements and similarities of the Unauthorized Products offered for sale, establishing that a logical relationship exists between them, and that Defendants' counterfeiting operation arises out of the same transaction, occurrence, or series of transactions or occurrences. Defendants take advantage of a set of circumstances, including the anonymity and mass reach afforded by the Internet and the cover afforded by international borders, to violate Plaintiff's intellectual property rights with impunity. Defendants attempt to avoid liability by operating under one or more Seller Aliases to conceal their identities, locations, and the full scope and interworking of their counterfeiting operation. Plaintiff is forced to file this action to combat Defendants' counterfeiting of its registered trademarks, as well as to protect consumers from purchasing Unauthorized Products over the internet. Plaintiff has been, and continues to be, irreparably damaged through consumer confusion and dilution of its valuable trademarks because of Defendants' actions and therefore seeks injunctive and monetary relief.

## III. THE PARTIES

4. Plaintiff, Merrigo Life, LLC, is a Texas limited liability company with its principal place of business at ███████████████████████████████, and is the owner of the trademark asserted in this action.

5. Plaintiff designs, markets, and sells a full line of ███████████████████  ███████████████████████████████.

6. Plaintiff's co-founder, Lillian Lau's inspiration for Merrigo Life arose from a lifelong love for plants. As a student at UC Davis, she cultivated this passion by working in a plant lab and frequently visiting campus greenhouses.

7. Despite her love for plants, Ms. Lau faced consistent challenges in maintaining thriving plants due to her busy lifestyle and frequent moves. These experiences of neglect and difficulty transporting plants fueled her desire for an alternative that could replicate the joy of plant ownership without the associated upkeep.

8. Seeking to translate her love of plants into an enduring and effortless solution, Ms. Lau developed her first concept, branded under the distinctive name ████████. The term was deliberately chosen for its evocative, memorable, and unique qualities, establishing a strong foundation for an innovative brand identity.

9. Plaintiff's inaugural product was a pillow inspired by the aesthetic essence of natural greenery, intentionally marketed and identified under the ████████ brand. This initial product design incorporated the spirit of nature while emphasizing permanence and simplicity.

10. After extensive prototyping, Ms. Lau finalized the design of the first ▇▇▇▇ ▇▇ achieving a product that aligned with her vision. The strong reception from friends and early customers validated both the product's appeal and the strength of the ▇▇▇▇ brand.

11. Motivated by the success of the ▇▇▇▇, the plaintiff founded ▇▇▇▇ ▇▇▇▇ in 2018. The company's mission became to create timeless, nature-inspired home decor under the unifying ▇▇▇▇ brand, offering a fresh and hassle-free way to bring the essence of plants into any living space.

12. Building on the initial success of the ▇▇▇▇ pillow, the plaintiff expanded the product line to include a full collection of nature-inspired pillows. Each design maintained the distinctiveness and thematic connection to the ▇▇▇▇ brand, reinforcing its identity as a symbol of timeless beauty and creativity. The expanded offerings further solidified Plaintiff's reputation as a leader in innovative plant-inspired decor.

13. Every product in Plaintiff's collection continues to reflect the foundational principles of the ▇▇▇▇ brand: an enduring connection to nature, paired with effortless elegance and functionality. The trademark has grown to symbolize not just a product, but an entire lifestyle centered on harmony, beauty, and simplicity.

14. Plaintiff's products have garnered widespread acclaim, amassing over 3,500 five-star reviews from satisfied customers. The unique designs and quality craftsmanship have been featured in reputable publications, further boosting their popularity.

15. Aligning with the company's nature-inspired ethos, Plaintiff partners with Trees for the Future, planting a tree for every purchase made. This initiative reflects Plaintiff's dedication to environmental sustainability and giving back to the planet.

16. The ▮▮▮▮▮ Trademark is registered with the United States Patent and Trademark Office and is included below.

| Registration Number | Trademark | Registration Date | Goods and Services |
|---|---|---|---|
| ▮▮▮▮ | ▮▮▮▮ | ▮▮▮▮ | ▮▮▮▮ |

17. The above U.S. registrations for the ▮▮▮▮▮ Trademark is valid, subsisting, and in full force and effect. The registration for the ▮▮▮▮▮ Trademark constitutes *prima facie* evidence of its validity and of Plaintiff's exclusive right to use the ▮▮▮▮▮ Trademark pursuant to 15 U.S.C. § 1057(b). A true and correct copy of the United States Registration Certificates for the ▮▮▮▮▮ Trademark is attached hereto as **Exhibit 1**.

18. The ▮▮▮▮▮ Trademark is exclusive to Plaintiff and is displayed extensively on Plaintiff's Products and in marketing and promotional materials. The ▮▮▮▮▮ Trademark is also distinctive when applied to Plaintiff's Products, signifying to the purchaser that the products come from Plaintiff and are manufactured to Plaintiff's quality standards. Whether Plaintiff manufactures the products itself or contracts with others to do so, Plaintiff has ensured that products bearing the ▮▮▮▮▮ Trademark are manufactured to the highest quality standards.

19. The ▮▮▮▮▮ Trademark has been continuously used and never abandoned. The success of Plaintiff, in addition to the marketing of Plaintiff's Products, has enabled Plaintiff's Brand to achieve widespread recognition and has made the ▮▮▮▮▮ Trademark one of the most well-known marks in the home decor industry. The outstanding reputation and significant goodwill associated with the Plaintiff's Brand have made the ▮▮▮▮▮ Trademark a valuable asset of Plaintiff.

20. Products bearing the ▮▮▮▮▮ Trademark have been the subject of substantial and continuous marketing and promotion. Plaintiff has marketed and promoted, and continues to

market and promote, the ▮▮▮▮ Trademark in the industry and to consumers through Plaintiff's website and its official Amazon store.

21. Plaintiff has expended substantial time, money, and other resources advertising, promoting, and marketing Plaintiff's Products. Plaintiff's Products have also been the subject of extensive unsolicited publicity due to the longstanding success of Plaintiff's brand. As a result, products bearing the ▮▮▮▮ Trademark are widely recognized and exclusively associated by consumers as being high-quality products sourced from Plaintiff. The ▮▮▮▮ Trademark has achieved tremendous fame and recognition, adding to the inherent distinctiveness of the marks. As such, the goodwill associated with the ▮▮▮▮ Trademark is of immeasurable value to Plaintiff.

22. Plaintiff's Products are sold only by Plaintiff and are recognized by the public as being exclusively associated with the Plaintiff's Brand.

23. On information and belief, Defendants listed in Schedule A attached hereto, either individually or jointly, operate one or more e-commerce stores under the Seller Aliases listed in Schedule A attached hereto. Tactics used by Defendants to conceal their identities and the full scope of their operation make it virtually impossible for Plaintiff to learn Defendants' true identities and the exact interworking of their counterfeit network. If Defendants provide additional credible information regarding their identities, Plaintiff will take appropriate steps to amend the Complaint.

24. All Defendants are alleged to have engaged in the following common activities:

    a. The unauthorized use of the ▮▮▮▮ Trademark in connection with goods that compete directly with Plaintiff's products.

    b. The sale or advertisement of infringing products via e-commerce platforms or other online marketplaces, targeting the same consumer base.

c. The use of similar marketing strategies to create a false association with the plaintiff's brand, thereby confusing customers.

25. Defendants' actions arise from the same series of transactions or occurrences because they rely on overlapping supply chains, counterfeit distribution networks, or marketing strategies to infringe on the ▮▮▮▮▮ trademark. Their infringing activities exploit the same or similar online sales channels, including but not limited to Amazon, eBay, Temu, Walmart, and Shopify, where they target Plaintiff's consumer base and cause widespread harm to the ▮▮▮▮▮ brand.

26. Joinder of Defendants in Schedule A is proper because all claims against them arise from the same series of transactions or occurrences. The claims involve identical legal and factual issues, including the unauthorized use of the ▮▮▮▮▮ Trademark and the likelihood of consumer confusion resulting from such use. Resolving these claims together promotes judicial economy and prevents inconsistent adjudications.

27. Allowing Plaintiff to pursue claims against all Defendants in one action prevents the fragmentation of litigation, which would otherwise burden the judicial system with multiple overlapping lawsuits. Each of Defendant's infringing activities contributes to the broader harm suffered by Plaintiff, making a single action the most efficient and fair method to address these related claims.

**IV. DEFENDANTS' UNLAWFUL CONDUCT**

28. The success of the Plaintiff has resulted in significant counterfeiting of the ▮▮▮▮▮ Trademark. Because of this, Plaintiff has implemented an anti-counterfeiting program that involves investigating suspicious websites and online marketplace listings identified in proactive Internet sweeps. Recently, Plaintiff has identified many fully interactive e-commerce

stores offering Unauthorized Products on online marketplace platforms like Amazon.com, Inc. ("Amazon"), eBay, Inc. ("eBay"), and Walmart, Inc. ("Walmart"), including the e-commerce stores operating under the Seller Aliases. True and correct copies of screenshot printouts showing the active e-commerce stores operating under the Seller Aliases reviewed are attached as **Exhibit 2**.

29. The Seller Aliases target consumers in this Judicial District and throughout the United States. According to a report prepared for The Buy Safe America Coalition, most counterfeit products now come through international mail and express courier services (as opposed to containers) due to increased sales from offshore online counterfeiters. *The Counterfeit Silk Road: Impact of Counterfeit Consumer Products Smuggled Into the United States*, prepared by John Dunham & Associates (**Exhibit 3**).

30. Because counterfeit products sold by offshore online counterfeiters do not enter normal retail distribution channels, the U.S. economy lost an estimated 300,000 or more full-time jobs in the wholesale and retail sectors alone in 2020. *Id*. When accounting for lost jobs from suppliers that would serve these retail and wholesale establishments, and the lost jobs that would have been induced by employees re-spending their wages in the economy, the total economic impact resulting from the sale of counterfeit products was estimated to cost the United States economy over 650,000 full-time jobs that would have paid over $33.6 billion in wages and benefits. *Id*. Additionally, it is estimated that the importation of counterfeit goods costs the United States government nearly $7.2 billion in personal and business tax revenues in the same period. *Id*.

31. Online marketplace platforms like those used by Defendants do not adequately subject new sellers to verification and confirmation of their identities, allowing counterfeiters to "routinely use false or inaccurate names and addresses when registering with these e-commerce

platforms." **Exhibit 4**, Daniel C.K. Chow, *Alibaba, Amazon, and Counterfeiting in the Age of the Internet*, 40 NW. J. INT'L L. & BUS. 157, 186 (2020); *see also* report on "Combating Trafficking in Counterfeit and Pirated Goods" prepared by the U.S. Department of Homeland Security's Office of Strategy, Policy, and Plans (Jan. 24, 2020), attached as **Exhibit 5**, and finding that on "at least some e-commerce platforms, little identifying information is necessary for a counterfeiter to begin selling" and that "[t]he ability to rapidly proliferate third-party online marketplaces greatly complicates enforcement efforts, especially for intellectual property rights holders." Counterfeiters hedge against the risk of being caught and having their websites taken down from an e-commerce platform by establishing multiple virtual storefronts. **Exhibit 5** at p. 22. Since platforms generally do not require a seller on a third-party marketplace to identify the underlying business entity, counterfeiters can have many different profiles that can appear unrelated even though they are commonly owned and operated. **Exhibit 5** at p. 39. Further, "[e]-commerce platforms create bureaucratic or technical hurdles in helping brand owners to locate or identify sources of counterfeits and counterfeiters." **Exhibit 4** at 186-187. Specifically, brand owners are forced to "suffer through a long and convoluted notice and takedown procedure only [for the counterfeit seller] to reappear under a new false name and address in short order." *Id*. at p. 161.

32. Defendants have targeted sales to Illinois residents by setting up and operating e-commerce stores that target United States consumers using one or more Seller Aliases, offer shipping to the United States, including Illinois, accept payment in U.S. dollars and, on information and belief, sell and/or offer for sale Unauthorized Products to residents of Illinois.

33. Defendants concurrently employ and benefit from similar advertising and marketing strategies. For example, Defendants facilitate sales by designing the e-commerce stores operating under the Seller Aliases so that they appear to unknowing consumers to be authorized

online retailers, outlet stores, or wholesalers. E-commerce stores operating under the Seller Aliases appear sophisticated and accept payment in U.S. dollars in multiple ways, including via credit cards, Alipay, Amazon Pay, and/or PayPal. E-commerce stores operating under the Seller Aliases often include content and images that make it very difficult for consumers to distinguish their stores from an authorized retailer. Plaintiff has not licensed or authorized Defendants to use the ▮▮▮▮ Trademark, and none of the Defendants are authorized retailers of Plaintiff's Products.

34. Many Defendants also deceive unknowing consumers by using the ▮▮▮▮ Trademark within the content, text, and/or meta tags of their e-commerce stores to attract consumers using search engines to find websites relevant to Plaintiff's Products. Other e-commerce stores operating under the Seller Aliases omit using the ▮▮▮▮ Trademark in the item title to evade enforcement efforts while using strategic item titles and descriptions that will trigger their listings when consumers are searching for Plaintiff's Products.

35. E-commerce store operators like Defendants commonly engage in fraudulent conduct when registering the Seller Aliases by providing false, misleading and/or incomplete information to e-commerce platforms to prevent discovery of their true identities and the scope of their e-commerce operation.

36. E- commerce store operators like Defendants regularly register or acquire new seller aliases for the purpose of offering for sale and selling Unauthorized Products. Such seller alias registration patterns are one of many common tactics used by e-commerce store operators like Defendants to conceal their identities and the full scope and interworking of their counterfeiting operation, and to avoid being shut down.

37. Even though Defendants operate under multiple fictitious aliases, the e-commerce stores operating under the Seller Aliases often share unique identifiers, such as templates with

common design elements that intentionally omit contact information or other information for identifying Defendants or other Seller Aliases they operate or use. E-commerce stores operating under the Seller Aliases include other common features, such as registration patterns, accepted payment methods, check-out methods, keywords, advertising tactics, similarities in price and quantities, the same incorrect grammar and misspellings, and/or the use of the same text and images. Additionally, Unauthorized Products for sale by the Seller Aliases bear similar irregularities and indicia of being counterfeit to one another, suggesting that the Unauthorized Products were manufactured by and come from a common source and that Defendants are interrelated.

38. E- commerce store operators like Defendants communicate with each other through QQ.com chat rooms and utilize websites, like sellerdefense.cn, that provide tactics for operating multiple online marketplace accounts and evading detection by brand owners. Websites like sellerdefense.cn also tip off e-commerce store operators like Defendants of new intellectual property infringement lawsuits filed by brand owners, such as Plaintiff, and recommend that e-commerce operators cease their infringing activity, liquidate their associated financial accounts, and change the payment processors that they currently use to accept payments in their online stores.

39. Counterfeiters such as Defendants typically operate under multiple seller aliases and payment accounts so that they can continue operation despite Plaintiff's enforcement. E-commerce store operators like Defendants maintain offshore bank accounts and regularly move funds from their financial accounts to offshore accounts outside the jurisdiction of this Court to avoid payment of any monetary judgment awarded to plaintiffs.

40. Defendants are working in active concert to knowingly and willfully manufacture, import, distribute, offer for sale, and sell Unauthorized Products in the same transaction,

occurrence, or series of transactions or occurrences. Defendants, without any authorization or license from Plaintiff have, jointly and severally, knowingly and willfully used and continue to use the ▇▇▇▇ Trademark in connection with the advertisement, distribution, offering for sale, and sale of Unauthorized Products into the United States and Illinois over the Internet.

41. Defendants' unauthorized use of the ▇▇▇▇ Trademark in connection with the advertising, distribution, offering for sale, and sale of Unauthorized Products, including the sale of Unauthorized Products into the United States, including Illinois, is likely to cause, and has caused, confusion, mistake, and deception by and among consumers and is irreparably harming Plaintiff.

42. Defendants' unauthorized use of the ▇▇▇▇ Trademark has and continues to irreparably harm Plaintiff through diminished goodwill and brand confidence, damage to Plaintiff's reputation, loss of exclusivity, and loss of future sales.

## COUNT I
## TRADEMARK INFRINGEMENT AND COUNTERFEITING (15 U.S.C. § 1114)

43. Plaintiff hereby re-alleges and incorporates by reference the allegations set forth in the preceding paragraphs.

44. This is a trademark infringement action against Defendants based on their unauthorized use in commerce of counterfeit imitations of the ▇▇▇▇ Trademark in connection with the sale, offering for sale, distribution, and/or advertising of infringing goods. The ▇▇▇▇ Trademark is a highly distinctive mark. Consumers have come to expect the highest quality from Plaintiff's Products offered, sold, or marketed under the ▇▇▇▇ Trademark.

45. Defendants have sold, offered to sell, marketed, distributed, and advertised, and are still selling, offering to sell, marketing, distributing, and advertising products using counterfeit reproductions of the ▇▇▇▇ Trademark without Plaintiff's permission.

46. Plaintiff is the owner of the ▮▮▮▮ Trademark. Plaintiff's United States registrations for the ▮▮▮▮ Trademark is in full force and effect. Upon information and belief, Defendants have knowledge of Plaintiff's rights in the ▮▮▮▮ Trademark and are willfully infringing and intentionally using infringing and counterfeit versions of the ▮▮▮▮ Trademark. Defendants' willful, intentional, and unauthorized use of the ▮▮▮▮ Trademark is likely to cause, and is causing, confusion, mistake, and deception as to the origin and quality of the Unauthorized Products among the general public.

47. Defendants' activities constitute willful trademark infringement and counterfeiting under Section 32 of the Lanham Act, 15 U.S.C. § 1114.

48. Plaintiff has no adequate remedy at law, and if Defendants' actions are not enjoined, Plaintiff will continue to suffer irreparable harm to its reputation and the goodwill of the ▮▮▮▮ Trademark.

49. The injuries and damages sustained by Plaintiff have been directly and proximately caused by Defendants' wrongful reproduction, use of advertisement, promotion, offering to sell, and sale of Unauthorized Products.

## COUNT II
## FALSE DESIGNATION OF ORIGIN (15 U.S.C. § 1125(a))

50. Plaintiff hereby re-alleges and incorporates by reference the allegations set forth in the preceding paragraphs.

51. Defendants' promotion, marketing, offering for sale, and sale of Unauthorized Products has created and is creating a likelihood of confusion, mistake, and deception among the general public as to the affiliation, connection, or association with Plaintiff or the origin, sponsorship, or approval of Defendants' Unauthorized Products by Plaintiff.

52. By using the ▇▇▇▇ Trademark in connection with the offering for sale and/or sale of Unauthorized Products, Defendants create a false designation of origin and a misleading representation of fact as to the origin and sponsorship of the Unauthorized Products.

53. Defendants' false designation of origin and misrepresentation of fact as to the origin and/or sponsorship of the Unauthorized Products to the general public involves the use of counterfeit marks and is a willful violation of Section 43 of the Lanham Act, 15 U.S.C. § 1125.

54. Plaintiff has no remedy at law and will continue to suffer irreparable harm to its reputation and the associated goodwill of the Plaintiff's Brand if Defendants' actions are not enjoined.

## COUNT III
## ILLINOIS UNFAIR COMPETITION

55. Plaintiff hereby re-alleges and incorporates by reference the allegations set forth in the preceding paragraphs.

56. By marketing, advertising, and selling their products in connection with the ▇▇▇▇ Trademark, or marks confusingly similar thereto, Defendants are acting with the purpose and intent to deceive consumers into believing that their products are made by Plaintiff or are affiliated with or approved by Plaintiff.

57. By marketing, advertising, and selling their products in connection with the ▇▇▇▇ Trademark, or marks confusingly similar thereto, Defendants intend to harm and are harming Plaintiff's business.

58. As a result of Defendants' unfair competitive activities, Plaintiff has been damaged and will continue to be damaged unless Defendants are enjoined from using the ▇▇▇▇ Trademark, or marks confusingly similar thereto.

59. Plaintiff is also entitled to recover money damages to compensate for Defendants' unfair conduct.

## COUNT IV
## ILLINOIS CONSUMER FRAUD AND DECEPTIVE BUSINESS PRACTICES ACT

60. Plaintiff hereby re-alleges and incorporates by reference the allegations set forth in the preceding paragraphs.

61. Defendants' aforementioned acts constitute deceptive business practices, in violation of the Consumer Fraud And Deceptive Business Practices Act of Illinois, 815 ILCS 505/1 *et. seq*.

## COUNT V
## ILLINOIS DECEPTIVE TRADE PRACTICES ACT

62. Plaintiff hereby re-alleges and incorporates by reference the allegations set forth in the preceding paragraphs.

63. Defendants' aforementioned acts constitute deceptive trade practices, in violation of the Deceptive Trade Practices Act of Illinois, 815 ILCS 510/1 *et. seq*.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment against Defendants as follows:

1) That Defendants, their affiliates, officers, agents, servants, employees, attorneys, confederates, and all persons acting for, with, by, through, under, or in active concert with them be temporarily, preliminarily, and permanently enjoined and restrained from:

   a. using the [REDACTED] Trademark or any reproductions, counterfeit copies or colorable imitations thereof in any manner in connection with the distribution, marketing, advertising, offering for sale, or sale of any product that is not a Plaintiff's Product or is not authorized by Plaintiff to be sold in connection with the [REDACTED] Trademark;

15

  b. passing off, inducing, or enabling others to sell or pass off any product as a Plaintiff's Product or any other product produced by Plaintiff, that is not Plaintiff's or not produced under the authorization, control, or supervision of Plaintiff and approved by Plaintiff for sale under the ▮▮▮▮ Trademark;

  c. committing any acts calculated to cause consumers to believe that Defendants' Unauthorized Products are those sold under the authorization, control, or supervision of Plaintiff, or are sponsored by, approved by, or otherwise connected with Plaintiff;

  d. further infringing the ▮▮▮▮ Trademark and damaging Plaintiff's goodwill; and

  e. manufacturing, shipping, delivering, holding for sale, transferring, or otherwise moving, storing, distributing, returning, or otherwise disposing of, in any manner, products or inventory not manufactured by or for Plaintiff, nor authorized by Plaintiff to be sold or offered for sale, and which bear the ▮▮▮▮ Trademark;

2) Entry of an Order that, upon Plaintiff's request, those with notice of the injunction, including without limitation, any websites and/or online marketplace platforms such as Amazon, eBay, and Walmart shall disable and cease displaying any advertisements used by or associated with Defendants in connection with the sale of counterfeit and infringing goods using the ▮▮▮▮ Trademark;

3) That Judgment be entered against Defendants finding that they have counterfeited upon the ▮▮▮▮ Trademark in violation of 15 U.S.C. § 1114;

4) That Judgment be entered against Defendants finding that they have committed acts of false designation of origin in violation of 15 U.S.C. § 1125(a);

5) That Judgment be entered against Defendants finding that they have committed acts of unfair competition under Illinois common law;

6) That Judgment be entered against Defendants finding that they have violated the Consumer Fraud And Deceptive Business Practices Act of Illinois, 815 ILCS 505/1 *et. seq.*;

7) That Judgment be entered against Defendants finding that they have violated the Deceptive Trade Practices Act of Illinois, 815 ILCS 510/1 *et. seq.*;

8) That Defendants account for and pay to Plaintiff all profits realized by Defendants by reason of Defendants' unlawful acts herein alleged, and that the amount of damages for infringement of the ▮▮▮▮▮ Trademark be increased by a sum not exceeding three times the amount thereof as provided by 15 U.S.C. § 1117;

9) In the alternative, that Plaintiff be awarded statutory damages for willful trademark counterfeiting pursuant to 15 U.S.C. § 1117(c)(2) of $2,000,000 for each and every use of the ▮▮▮▮▮ Trademark;

10) That Plaintiff be awarded its reasonable attorneys' fees and costs; and

11) Award any and all other relief that this Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

Dated: March 14, 2025    Respectfully submitted,

/s/ Nicholas S. Lee
Nicholas S. Lee
nslee@dickinson-wright.com
Sameeul Haque
shaque@dickinson-wright.com
DICKINSON WRIGHT, PLLC
55 W. Monroe Street, Suite 1200
Chicago, IL 60603
Telephone: (312)641-0060
Facsimile: (844) 670-6009

*Counsel for Plaintiff, Merrigo Life, LLC*

## **VERIFICATION**

I, Lillian Lau, hereby certify as follows:

1. I am the Chief Executive Officer for Merrigo Life LLC. As such, I am authorized to make this Verification on Merrigo Life LLC's behalf.

2. I have read the foregoing Verified Complaint and, based on my personal knowledge and my knowledge of information reported to me by subordinates and colleagues who report to me, the factual allegations contained in the Verified Complaint are true.

3. I certify under penalty of perjury under the laws of the United States of America that the foregoing statements made by me are true and correct.

Executed in  Carrollton, Texas                                             on March  03 , 2025

*Lillian Lau*
Lillian Lau
Chief Executive Officer